[596 NYS2d 380]

FRANCISCO LEON, Respondent, v J & M PEPPE REALTY CORP. et al., Respondents-Appellants.

J & M PEPPE REALTY CORP., Third-Party Plaintiff-Respondent-Appellant, v SEPTET ASSOCIATES, Third-Party Defendant-Respondent-Appellant, and ESP CONSTRUCTION Co., Third-Party Defendant-Appellant-Respondent.

SEPTET ASSOCIATES, INC., Second Third-Party Plaintiff-Respondent-Appellant, v ESP CONSTRUCTION Co., Second Third-Party Defendant-Appellant-Respondent.

First Department, April 20, 1993

APPEARANCES OF COUNSEL

*Martin S. Rothman* of counsel, New York City *(Peter R. Cella, Alyne I. Diamond* and *Eric S. Levine* with him on the brief; *Duignan & Cella* and *Seligson, Rothman & Rothman,* attorneys), for ESP Construction Co.

*Ann K. Kandel* of counsel, Woodbury *(Joseph W. Conklin,* attorney), for J & M Peppe Realty Corp.

*Peter E. Finning* of counsel, New York City *(Langan & Levy,* attorneys), for Septet Associates Inc.

*Barbara E. Olk* of counsel, New York City *(Ted Trief* with her on the brief; *Trief & Olk,* attorneys), for respondent.

**OPINION OF THE COURT**

Sullivan, J. P.

On August 4, 1987, plaintiff Francisco Leon, 26 years of age, suffered a partial amputation of the three middle fingers of his left hand while operating a circular saw in a vacant Bronx store owned by defendant and third-party plaintiff J & M

Peppe Realty Corp. during the course of his employment with ESP Construction Co., a third-party defendant herein, which had been hired by defendant Septet Associates, Inc., the general contractor, to renovate the storefront.

Highly regarded and considered as having foreman potential, plaintiff, with several years of carpentry experience, including the use of a hand-held circular saw, had been hired by ESP as a carpenter approximately four months before the accident on the recommendation of Dario Corredor, a four- or five-year ESP employee, who trained plaintiff in the nuances of storefront construction. Plaintiff, already experienced, did not require any instruction in carpentry or the use of carpentry tools. He had his own tools, including the circular saw which he was using at the time of the accident. Although senior to plaintiff, who took instructions from him as to some aspects of the work, Corredor was not the foreman at the jobsite.

On the day of the accident, plaintiff and Corredor were directed to go to the worksite and complete the job. Before leaving, plaintiff precut the lumber he would need from measurements he had previously taken. Since he was unsure of the measurements, plaintiff requested that he be allowed to take a piece of equipment known as an ehlu, a self-standing table saw with its own safety guards, to the site. ESP's manager denied his request, explaining that one ehlu was needed in the shop to cut frames and that the only other available one was already at another jobsite in Brooklyn. Plaintiff also testified that he was unable to take a noncollapsable saw horse to the site because of the lack of space in the company van; this claim was disputed, however, ESP offering evidence that there was room in the van for such equipment.

In any event, after loading the van with the necessary materials and equipment, plaintiff and Corredor arrived at the worksite between 10:00 and 11:00 A.M. At approximately 1:00 P.M., just prior to the accident, plaintiff realized that he had mismeasured a piece of plywood. Since it was too late in the day to go back to the ESP shop, an hour's trip away, to use the ehlu or a saw horse and he was reluctant to leave Corredor alone at an unsecured jobsite, plaintiff decided to place the two-foot-long piece of plywood that had to be cut on a landing within the store. Using his left hand to brace the plywood, approximately one foot of which was overhanging the landing, with his left thumb underneath it, plaintiff used his right hand to operate the circular saw. When the saw

reached the halfway point, it became caught and stopped cutting, something that, in plaintiff's experience, had never happened before. As plaintiff attempted to lift the blade, which was now spinning in reverse fashion, the saw "jerked back" onto the plywood where plaintiff's left hand was resting, severing the three middle fingers. When asked at trial why he did not remove his finger from the saw's trigger, plaintiff explained, "I didn't see no danger in what I was doing. I wanted to look a little bit so I lifted a little bit".

Corredor disputed this version of the accident. He testified that plaintiff directed him to hold the circular saw in an upside-down fashion so that it would act as a table saw. Although he realized that this was dangerous and told plaintiff so, Corredor did as he was requested. Corredor testified that he balanced the circular saw on a container and depressed the trigger while plaintiff pushed the plywood across the saw. The accident occurred while plaintiff was pushing the wood in this fashion.

Neither Peppe nor Septet had any representative at the jobsite at the time of the accident. Peppe never sent a representative to any of its locations where construction work was being performed; it relied instead on Septet, its general contractor, to oversee the work. Septet periodically visited its jobsites, but did not supervise its subcontractors' work. While Septet denied having any knowledge that ESP would be at the jobsite on the day of the accident, ESP claimed that it had so notified Septet.

At the close of the evidence, the trial court dismissed all of the claims against Peppe sounding in common-law negligence and alleging a violation of section 200 of the Labor Law. The jury exonerated Peppe of liability under section 241 (6). It found that Septet violated Labor Law § 200 and that the violation was a proximate cause of the accident; it further found that Septet did not violate section 241 (6) and that, while it was negligent, its negligence was not a proximate cause of the accident. On the third-party claims, the jury found that ESP had violated both sections 200 and 241 (6) of the Labor Law, as it was charged it could do, that ESP had been negligent and that, as to each claim of liability, proximate cause had been demonstrated. Plaintiff was found to be free of any negligence. On the question of apportionment, ESP was found 80% responsible and Septet 20%. On the postverdict motions, the IAS Court set aside the jury's finding that Peppe did not violate Labor Law § 241 (6), granted plaintiff

judgment against Peppe for such violation and, in turn, granted Peppe judgment over against Septet and ESP for complete indemnification.

The jury awarded plaintiff damages as follows:

(1) $100,000 for pain and suffering from the date of the accident (August 4, 1987) until verdict (June 21, 1991); and

(2) $1,500,000 for future pain and suffering; and

(3) 40 years for future pain and suffering; and

(4) $74,048 for past lost earnings; and

(5) $629,408 for future lost earnings; and

(6) 34 years for future lost earnings (although the court charged that plaintiff's worklife expectancy was 31 years); and

(7) $14,027 for medical expenses.

The court set aside the verdict on the ground of excessiveness unless plaintiff stipulated to a reduction of the total verdict of $2,317,483 to $1,188,000 ($1,500,000 award for future pain and suffering reduced to $750,000; the $629,408 award for future lost earnings reduced to $250,000 and the $74,048 award for past lost earnings and $14,027 award for medical expenses rounded to $74,000 and $14,000, respectively), to which plaintiff agreed. A judgment in accordance therewith was thereafter entered, from which ESP appeals and Septet and Peppe cross-appeal.

■ A review of the evidence reveals that, contrary to their arguments, both Peppe and Septet owed plaintiff a duty under Labor Law § 241 (6), which imposes a nondelegable duty on owners and contractors "to provide reasonable and adequate protection and safety to the persons employed therein" with respect to "[a]ll areas in which construction, excavation or demolition work is being performed." This duty inheres irrespective of the owners' and contractors' lack of active control or supervision of the site. *(Allen v Cloutier Constr. Corp.,* 44 NY2d 290, 300, *rearg denied* 45 NY2d 776; *see, Kelleher v First Presbyt. Church,* 158 AD2d 946, *lv dismissed* 75 NY2d 947.)

A failure to have proper equipment at the construction site constitutes a violation of Labor Law § 241 (6). *(See, Tuohey v Gainsborough Studios,* 183 AD2d 636; *see also, Mascellino v Buffalo Gen. Hosp.,* 123 AD2d 507.) The section also provides for the promulgation of "rules to carry into effect the provisions of this subdivision, and the owners and contractors and their agents for such work * * * shall comply therewith." In this regard, the trial court instructed the jury with respect to,

*inter alia,* New York State Industrial Code (12 NYCRR) § 23-1.5 (a), which provides that the obligation to provide safe working conditions applies with respect to "working conditions, safety devices, types of construction, methods of demolition and of excavation and the materials, means, methods and procedures required by this Part (rule)."

Since the evidence was clear that an ehlu, not a circular saw, was the proper tool to cut the plywood in question, and a carpenter's horse, not a landing, should have been employed in its absence, and that no such tool or device was present, the jobsite, in terms of work operations, was not reasonably safe. Irrespective of whether plaintiff's or Corredor's testimony as to how the accident occurred was accepted, the use of a circular saw without a saw horse was, as this record shows, not reasonably safe. Nor was proximate cause an issue. Thus, in resolving the third-party claims, the jury correctly found that ESP, in failing to provide the proper equipment, was negligent. ESP also violated Labor Law § 200 by failing in its general duty to protect the health and safety of its employee, as well as section 241 (6) by failing to provide the proper equipment at the construction site. Although section 241 (6) does not expressly apply to subcontractors *(see, e.g., Rosenbaum v Lefrak Corp.,* 80 AD2d 337, 342, *appeal dismissed* 54 NY2d 904), ESP, to which the carpentry work had been delegated, was concomitantly delegated the authority to supervise and control that work and became the statutory agent of the general contractor under section 241. *(See, McGurk v Turner Constr. Co.,* 127 AD2d 526, 529-530; *Russin v Picciano & Son,* 54 NY2d 311, 317-318.)

This finding of liability mandated, as well, the imposition of liability pursuant to Labor Law § 241 (6) against the owner, Peppe, against which the court later directed a verdict on that issue, and the contractor, Septet, since, as noted, section 241 (6) imposes a nondelegable duty on owners and general contractors to provide reasonable and adequate protection to workers and renders them liable for injuries proximately caused by a violation thereof irrespective of their control or supervision of the worksite. *(Allen v Cloutier Constr. Corp., supra,* 44 NY2d 290.) It is, of course, of no moment that neither Peppe nor Septet had actual or constructive notice of ESP's failure to provide the proper equipment to its workers for purposes of liability under Labor Law § 241 (6). *(See,*

*Tuohey v Gainsborough Studios, supra,* 183 AD2d 636.) Thus, a directed verdict should also have been entered against Septet.

■ While Peppe argues that plaintiff was required to plead and prove a violation of a regulation promulgated by the Board of Standards and Appeals in order to recover under Labor Law § 241 (6), it should be noted that nowhere in the language of section 241 (6), which, on its face, makes the test one of "reasonable and adequate protection", a negligence standard, is a violation of an administrative regulation made a prerequisite to a finding of liability thereunder. Labor Law § 241 (6) merely provides that the Commissioner "may make rules", not that such rules are mandatory or a condition to the statute's enforcement. Peppe's reading would render the statute ineffective if the Commissioner had elected not to promulgate any regulations. This result would defeat the legislative intention of imposing liability on the owner and general contractor *(Nagel v Metzger,* 103 AD2d 1, 7-8) and would be contrary to well-settled principles of statutory construction. It would also be inconsistent with the recognized interpretation of Labor Law § 200 (1), which, like section 241 (6), provides that "[t]he Board may make rules to carry into effect the provisions of this section" and which has consistently been held to represent a codification of the common law of negligence *(see, Allen v Cloutier Constr. Corp., supra,* 44 NY2d 290). Despite the existence of essentially identical language, section 200 has never been considered as requiring a violation of an administrative regulation as a precondition to a finding of liability. There is no reason to construe the same language in the two related sections differently.

While the Third Department has held that "an action predicated upon Labor Law § 241 (6) must refer to a violation of the specific standards set forth in the implementing regulations" *(Simon v Schenectady N. Congregation of Jehovah's Witnesses,* 132 AD2d 313, 317, citing *Long v Forest-Felhaber,* 55 NY2d 154, 160), this Court has never expressly so held and we decline to adopt such a rule. We are, rather, in accord with the view of the Fourth Department that proof of a violation of a regulation is not necessary to sustain a section 241 (6) cause of action since that section "merely imposes vicarious liability on owners only where the predicate cause of action of common-law negligence exists against the contractor, subcontractor or employ[er] [and t]here is no need to show that a violation of administrative regulations occurred to establish a

cause of action in negligence." *(Nagel v Metzger,* 103 AD2d, *supra,* at 7.)[1]

In any event, plaintiff did present evidence of a violation of certain administrative regulations, namely, 12 NYCRR 23-1.5 (a), (b) and (c), and the court submitted these regulations to the jury for its consideration. Peppe, however, argues that since subdivisions (a), (b) and (c) of section 23-1.5 do not themselves contain any specific standard of safety or conduct that must be followed or specify the devices to be employed at a construction site, plaintiff, for all practical purposes, has failed to allege any regulatory violation at all. While these subdivisions speak in general terms, the responsibilities of an owner, contractor or their agents are clearly and specifically set forth. We are unable to discern any logical basis for the proposition that only certain designated regulations would count towards a violation of Labor Law § 241 (6).

■ Although a determination that Labor Law § 241 (6) was violated renders unnecessary the issue of whether there was also a violation of Labor Law § 200, the jury could properly find, as it did from the evidence, that both sections were violated. Labor Law § 200, which governs general safety in the workplace, imposes upon employers, owners, and contractors the affirmative duty to exercise reasonable care to provide and maintain a safe place to work and is a reiteration of common-law negligence standards *(see, Allen v Cloutier Constr. Corp., supra,* 44 NY2d 290). Therefore, a party charged with liability must be shown to have notice, actual or constructive, of the unsafe condition and to have exercised sufficient control over the work being performed to correct or avoid the unsafe condition. *(See, Dube v Kaufman,* 145 AD2d 595.)

Here, the jury's finding of a Labor Law § 200 violation by Septet for failure to provide a safe place to work could only be justified on the basis of its concomitant duty to make reasonable inspections to detect dangerous conditions. *(DaBolt v Bethlehem Steel Corp.,* 92 AD2d 70, 73, *appeal dismissed* 60 NY2d 701; *Monroe v City of New York,* 67 AD2d 89, 96.) Aware of its continuing obligation to inspect the worksite, Septet had done so, finding no irregularities, and was unaware of any prior incidents where ESP, with which it had contracted on other projects, had failed to provide adequate safety

1. We do not construe the Court of Appeals recent decision in *Ares v State of New York* (80 NY2d 959, 960) as holding that there can be no section 241 (6) claim in the absence of a violation of a safety regulation.

devices to its employees. Insofar as Septet was aware, ESP's employees were at the worksite on the day of the accident only to take care of certain punch list items. It had no knowledge, actual or otherwise, that plaintiff would be sent to the worksite without the proper equipment. Thus, there is insufficient proof to support the verdict against Septet based on a Labor Law § 200 violation. This disposition, of course, in no way affects our directed verdict of liability against Septet for a Labor Law § 241 (6) violation, but it does permit Septet, as the general contractor, to look to ESP, the active tortfeasor, for common-law indemnification for ESP's negligence in causing plaintiff's injuries.

■ As a general rule, a general contractor is entitled to common-law indemnity from a subcontractor whose negligence is the cause of a worker's injuries. Here, it cannot be disputed that Septet did not control, supervise or direct the work of plaintiff, ESP's employee. Indeed, for reasons already stated, Septet's liability is purely statutory, imposed as a result of its status as a general contractor and its concomitant duty "to provide reasonable and adequate protection and safety" to the workers in areas where "construction, excavation or demolition work is being performed." (Labor Law § 241 [6].) Nor was anyone from Septet present at the accident site on the day of the accident. Septet's liability is not predicated on fault; rather, it is statutorily imputed because of its status as a general contractor and "attaches irrespective of whether due care was exercised and without reference to principles of negligence [citations omitted.]" *(Brown v Two Exch. Plaza Partners,* 76 NY2d 172, 179). Since Septet's only liability is a statutory one, not one based on negligence or from which negligence may be inferred, it is entitled to common-law indemnification from the active tortfeasor. *(See, Kemp v Lakelands Precast,* 55 NY2d 1032; *Kelly v Diesel Constr. Div.,* 35 NY2d 1.)

■ ESP and Septet also argue that because plaintiff fully knew and understood the risk confronting him he assumed the risk, thus warranting judgment in their favor, and that, in any event, the jury's determination that he was free of any culpable conduct is against the weight of the credible evidence. There is merit to the latter but not the former. With the enactment of the comparative negligence statute *(see,* CPLR 1411), effective September 1, 1975, assumption of the risk is no longer an absolute defense; except for an express assumption, assumption of the risk has no separate existence

and is merely a way of " 'stating certain no-duty rules'." *(Turcotte v Fell,* 68 NY2d 432, 438, quoting James, *Assumption of Risk: Unhappy Reincarnation,* 78 Yale L J 185, 187-188.) It is a factor to be considered "when measuring a defendant's duty to a plaintiff." *(Turcotte v Fell, supra,* at 438.)

On the issue of plaintiff's culpability, even his own construction expert acknowledged that plaintiff's method of cutting the plywood was "hazardous" and that a saw horse or fixed table saw should have been used. According to plaintiff's own account, he chose not to ask Corredor, who was only 10 feet away, to assist him. Instead, plaintiff, who had an obligation to conduct himself in a manner befitting a reasonably prudent carpenter, decided to cut the plywood by himself. The danger presented was only heightened when, with his hand on the trigger generating power, plaintiff lifted up the saw to examine the blade, which had jammed in the plywood, thereby precipitating his own injuries when the saw jerked back. Whichever version of the accident—Corredor's, that the circular saw was being used in upside-down fashion as a table saw, or plaintiff's, that he had placed the plywood on a landing and that the blade became stuck cutting it—is accepted, the finding of the jury, which usually determines a plaintiff's degree of culpability *(see, e.g., McLean v Wical Realty Corp.,* 182 AD2d 554), of no comparative negligence is unsupportable and clearly against the weight of the credible evidence. In our view, an allocation of 15% culpability on plaintiff's part is more in accord with the evidence.

Plaintiff argues that his culpable conduct should be excused because the voluntariness of his actions was overcome by compulsion, that is, the directive of his superior, and economic circumstances which impelled compliance, i.e., loss of his job. *(See, Benitez v New York City Bd. of Educ.,* 73 NY2d 650, 658.) Initially, we note that the trial court refused, rightfully, we find, to charge on the issue of economic compulsion since there is no factual support for such an instruction. Thus, the jury's finding of no culpability cannot be justified on that basis, since the relevant mitigating factors were not explained to it. There was neither any testimony that Corredor, or anyone else, for that matter, ever directed plaintiff, an experienced carpenter, as to how to cut the plywood nor any evidence of an economic circumstance " 'which equally impels' compliance with the direction". *(Supra,* at 658, quoting *Verduce v Board of Higher Educ.,* 9 AD2d 214, 219 [dissenting opn], *revd for reasons stated in dissenting opn* 8 NY2d 928.) In

any event, plaintiff's present claim that he "needed the job to support his wife and forthcoming child" should fall on deaf ears. As the record shows, he was not married at the time of the accident.

■ We also reject ESP's argument, on the issue of proximate cause, that, irrespective of whether plaintiff's or Corredor's version is accepted, plaintiff's method of cutting the plywood at the time of the accident was an intervening, unforeseeable superseding event, which absolves the defendants of any liability. "A plaintiff need only show that his injury was substantially caused by the defendant's negligent conduct [citation omitted] and 'need not demonstrate * * * that the precise manner in which the accident happened * * * was foreseeable' " (Rapp v Zandri Constr. Corp., 165 AD2d 639, 643, quoting Derdiarian v Felix Contr. Corp., 51 NY2d 308, 315). Since the determination of legal causation turns on the foreseeability of the injury attributed to the defendant's conduct and "questions concerning what is foreseeable and what is normal may be the subject of varying inferences, as is the question of negligence itself, these issues generally are for the fact finder to resolve." (Derdiarian v Felix Contr. Corp., supra, at 315.) On this record, a jury could find that plaintiff's use of his personal circular saw without the use of safeguards or a saw horse was not totally unforeseeable and that such use would cause injury. Thus, the causal connection of failing to provide the proper equipment or devices was not, as a matter of law, severed by plaintiff's particular method of handling the circular saw, irrespective of whose version, his or Corredor's, was accepted as to the manner in which he used it.

■ ESP also argues that an agreement reached at trial, after all the evidence had been presented and just before summations, between counsel for plaintiff and Peppe not to sum up against each other and calling for Peppe's counsel to acknowledge liability pursuant to Labor Law § 241 (6) constituted an impermissible "Mary Carter agreement", which deprived the trial of its adversarial character, thus requiring reversal and a new trial. Without reaching the question of whether all such agreements are invalid, we find that no such agreement was reached in the circumstances here presented. (Cf., Stiles v Batavia Atomic Horeshoes, 174 AD2d 287, revd on other grounds 81 NY2d 950.)

In Booth v Mary Carter Paint Co. (202 So 2d 8 [Fla Dist Ct App 1967]), the case which gave rise to the phrase "Mary Carter agreement", the court upheld, as not constituting a

release, a secret arrangement, reduced to writing and signed by the parties, between the plaintiff and two of the five defendants to have the latter, despite an agreement limiting the liability of those defendants to a sum certain, continue to litigate the matter in order to thrust the lion's share of liability on the nonagreeing defendants. The court refused to offset against the amount for which the other defendants were held liable the $12,500 consideration being paid by the two defendants who participated in the agreement with plaintiff.

The term "Mary Carter agreement" was coined in *Ward v Ochoa* (284 So 2d 385, 387 [Fla Sup Ct 1973]), which defined it as "a contract by which one co-defendant secretly agrees with the plaintiff that, if such defendant will proceed to defend himself in court, his own maximum liability will be diminished proportionately by increasing the liability of the other co-defendants." The court went on to note that "[s]ecrecy is the essence of such an arrangement, because the court or jury as trier of the facts, if apprised of this, would likely weigh differently the testimony and conduct of the signing defendant as related to the non-signing defendants". *(Supra,* at 387.) Recognizing the potential of such arrangements to pervert the trial process and finding that they are essentially collusive, a divided court rejected the views expressed in *Booth v Mary Carter Paint Co. (supra),* and held that a new trial was required as to the nonsigning defendants because of the trial court's error in refusing to admit the agreement in evidence.

Here, it should be noted, there was no agreement that Peppe make any payment to plaintiff or that its liability be limited or reduced if the nonagreeing defendants' liability were increased. The jury's determination as to liability and damages was to govern. What was involved was no more than an agreement as to the summation strategy of plaintiff and Peppe with respect to each other, which, in that regard, is not materially different from many of the tactical and strategic agreements reached between counsel for adverse parties in any trial. For instance, in many trials involving workplace injuries, the various defendants, in concerted action, attempt to place all the responsibility for the accident on the employer/third-party defendant in light of the bar of the Workers' Compensation Law. The agreement involved herein was even more benign since, in no way, did it affect the presentation of evidence. Moreover, the other defendants were not in any way prejudiced. As noted, the evidence was unaffected; the jury was able to ignore the admission of liability and find

that neither Peppe nor Septet had violated Labor Law § 241 (6) and that ESP's Labor Law violation was clear.

It should also be noted that during the liability phase of the trial Peppe's counsel adamantly refused plaintiff's offer to discontinue his Labor Law § 200 and common-law negligence claims in exchange for Peppe's formal admission of liability under Labor Law § 241 (6). Furthermore, it should be noted, at the time of summations, plaintiff was no longer in a bargaining position to extract such a concession of liability from Peppe since, the Labor Law § 200 and common-law negligence claims against Peppe having been dismissed at the close of the evidence, the *quid pro quo* for such a bargain, i.e., the offer of a discontinuance of the Labor Law § 200 and common-law negligence claims, was no longer viable.

Moreover, the agreement between plaintiff's and Peppe's counsel not to sum up against one another was entirely consistent with Peppe's trial strategy and, in fact, furthered that strategy. At trial, Peppe consistently maintained that it was not actively involved in any of the construction or renovation work being undertaken by ESP under its subcontract with Septet. Consistent with that position, its focus in questioning witnesses produced by ESP or Septet and, in fact, plaintiff himself was in eliciting testimony that Peppe was not present during any phase of the work and that all work-related decisions were made either by Septet or ESP. Knowing that the court would charge Labor Law § 241 (6), Peppe's counsel could consistently argue and, at the same time, maintain credibility with the jury by acknowledging that, in accordance with the court's charge, if the jury found ESP or Septet, the general contractor, liable under Labor Law § 241 (6), Peppe would also be statutorily liable. Peppe's trial strategy, of course, was to highlight the active wrongdoing of ESP and Septet as opposed to its purely passive and vicarious liability.

■ As for damages, ESP argues that the monetary award to plaintiff, even as reduced by the trial court, "deviates materially from what would be reasonable compensation" (CPLR 5501 [c]). Plaintiff suffered a painful amputation injury, which, while involving his nondominant hand, necessitated surgical amputation and, eventually, a second surgical amputation to remove the nail and nail bed on the ring finger. In the second surgical procedure, steel wires were placed across the joint to hold the middle finger in place and pieces of bone broken to create a mass of bone chips which were intended to heal in a solid position and create a solid joint. As a result, the joint in

the middle finger has been destroyed between the middle and end bone, leaving the middle finger motionless. Plaintiff has been left with a stump for an index finger. The end joint of the ring finger is completely missing. Plaintiff has lost 50% of his ability to grab; he cannot grasp a narrow tool. Buttoning his collar is difficult. He is subject to osteomyelitis. His fingers are sensitive to the cold; he experiences pain in the affected fingers. The record shows that plaintiff also suffered serious emotional difficulties as a result of his injuries, and had to seek psychiatric help for a posttraumatic stress disorder.

At the time of the accident plaintiff was earning $356 a week. After the accident, with borrowed money, he took a course to learn to work with heavy equipment. He now finds it difficult to work in cold weather because of its effect on his injured fingers. A vocational rehabilitation counselor and evaluator testified that plaintiff's injuries had caused him to lose the capacity to perform 65% of the work he had been able to do before his injury. At the time of trial, plaintiff had moved to Puerto Rico where he worked at a naval base performing plumbing maintenance, earning approximately $280 a week. He was then earning $150 a week and $7,800 a year less than Corredor and $14,040 a year less than he had earned in 1987 as a foreman before being hired by ESP.

As noted, the jury awarded $100,000 for past and, covering a 40-year period, $1,500,000 for future pain and suffering. The trial court reduced the latter by 50% to $750,000, reflecting an award of about $19,000 per year, and cut the future lost earnings award of $629,408 by almost 60% to $250,000 or approximately $8,000 a year over a work expectancy of 34 years. These awards, as reduced, are not out of line with recent awards sustained by appellate courts. *(See, e.g., Dauria v City of New York,* 178 AD2d 289, *lv denied* 80 NY2d 751; *Stiles v Batavia Atomic Horseshoes, supra,* 174 AD2d 287, *revd on other grounds* 81 NY2d 950.) We also note that the trial court's assessment of future lost earnings, $250,000, more closely approximates plaintiff's lost earnings using Corredor's earnings as a point of comparison. Thus, we reject the claim that the verdict, as reduced by stipulation, is excessive.

█ Finally, ESP urges that the judgment is not in harmony with the trial court's decision on the postverdict motions and improperly awards plaintiff a direct recovery against ESP, his employer, a third-party defendant against which plaintiff could not, by virtue of the bar of Workers' Compensation Law § 11, and did not assert a direct action *(see, Smith v Hooker*

*Chems. & Plastics Corp.,* 89 AD2d 361, 366, *appeal dismissed* 58 NY2d 824), erroneously requires ESP to purchase and guarantee the purchase and payment of an annuity contract and improperly awards judgment against Peppe only if Septet and ESP fail to pay their respective shares.[2] ESP's argument is well taken. Plaintiff cannot recover a judgment against an impleaded party against which it has not asserted a direct action. *(Society of N. Y. Hosp. v Mogensen,* 83 Misc 2d 840.) The judgment should have run only against Septet and, in accordance with the court's own postverdict decision, Peppe. Any judgment with respect to ESP should have been conditional, that is, its liability does not arise until the primary defendants, Peppe and Septet, have satisfied the judgment in whole or part. *(See, McCabe v Queensboro Farm Prods.,* 22 NY2d 204.)* In the event plaintiff stipulates to accept an assessment of 15% comparative negligence, the judgment should be further modified to reduce the amount of the judgment accordingly.

We have examined the other contentions raised by the parties and find that they are either unpreserved or without merit.

Accordingly, the judgment of the Supreme Court, Bronx County (Howard Silver, J.), entered on April 6, 1992, should be modified, on the law and on the facts, and in the exercise of discretion, without costs or disbursements, to strike therefrom any factual finding inconsistent herewith, to eliminate the provision which allows plaintiff to recover directly from ESP, to grant Septet judgment over against ESP for the full amount of the recovery against it, and to order a new trial solely on the issue of liability unless, within 20 days after service upon his attorneys of a copy of the order to be entered herein, with notice of entry, plaintiff stipulates to accept an allocation of 15% comparative negligence and a corresponding reduction of the award of damages in his favor and serves and files in the office of the clerk of the trial court a written stipulation agreeing to said allocation and reduction and to the entry of an amended judgment in accordance therewith. If plaintiff so stipulates, the judgment as modified and so amended is affirmed, without costs or disbursements.

WALLACH, ROSS and ASCH, JJ., concur.

Judgment of the Supreme Court, Bronx County, entered on

---

2. Although ESP timely moved to resettle the judgment, the motion had not been decided at the time this appeal was heard.

April 6, 1992, is modified, on the law and on the facts, and in the exercise of discretion, without costs or disbursements, to strike therefrom any factual finding inconsistent herewith, to eliminate the provision which allows plaintiff to recover directly from ESP, to grant Septet judgment over against ESP for the full amount of the recovery against it, and to order a new trial solely on the issue of liability unless, within 20 days after service upon his attorneys of a copy of the order to be entered herein, with notice of entry, plaintiff stipulates to accept an allocation of 15% comparative negligence and a corresponding reduction of the award of damages in his favor and serves and files in the office of the clerk of the trial court a written stipulation agreeing to said allocation and reduction and to the entry of an amended judgment in accordance therewith. If plaintiff so stipulates, the judgment as modified and so amended is affirmed, without costs or disbursements.