**Ellen KUKLA, Plaintiff,**

v.

**The SYFUS LEASING CORP., Defendant.**

**No. 95 Civil 2699 (DC).**

United States District Court, S.D. New York.

June 26, 1996.

Roemer, Wallens & Mineaux, L.L.P. by Richard J. Zahnleuter, Albany, New York, for Plaintiff.

Jacobowitz, Garfinkel & Lesman by Alyson M. Piscitelli, New York City, for Defendant.

## OPINION

CHIN, District Judge.

On August 29, 1994, while she was a guest at the Holiday Inn in Newburgh, New York, plaintiff Ellen Kukla was raped in her room by an intruder. The man—a stranger—was never apprehended. Plaintiff commenced this diversity action against defendant Syfus Leasing Corp., the owner and operator of the hotel, seeking damages for her injuries and alleging that defendant breached its duty to provide reasonably safe and secure lodging for its guests.

The case was tried to a jury in May 1996. The jury returned a verdict in favor of plain-

tiff, finding defendant negligent and setting plaintiff's damages at $1,515,548.47, consisting of: $750,000 for past pain and suffering, $600,000 for future pain and suffering, $6,417 for lost wages, $9,131.47 for other expenses and losses, and $150,000 for the cost of future psychological counseling. The jury also found, however, that plaintiff was contributorily negligent and apportioned fault at 60% for defendant and 40% for plaintiff. Hence, unless the jury's findings are set aside, plaintiff will recover 60% of $1,515,548.47—or $909,329.08.

Before the Court is defendant's motion for a new trial or for judgment as a matter of law. Defendant argues that the jury's finding of liability is against the weight of the evidence, that the jury's award of $750,000 for past pain and suffering and $600,000 for future pain and suffering is excessive, and that the jury's award of $150,000 for the cost of future psychological counseling is speculative and without support in the evidence.

For the reasons that follow, the motion is denied, except to the extent that the award of $150,000 for the cost of future psychological counseling is vacated. A new trial limited solely to the amount of damages for future psychological counseling will be ordered unless plaintiff accepts a remittitur reducing the award for such damages to $31,200.

## STATEMENT OF THE CASE

### A. The Facts [1]

In August of 1994, plaintiff was 21 years old. She lived in a small town outside of Columbus, Ohio and had never travelled alone. Her boyfriend was a cadet at the U.S. Military Academy at West Point, New York. He invited plaintiff to visit him at West Point to participate in the "Ring Ceremony Weekend" for senior cadets. She accepted and travelled by herself to New York on Thursday, August 25, 1994, to participate in the festivities.

On Sunday, August 28, 1994, after spending the day with her boyfriend, plaintiff drove to the Holiday Inn in Newburgh, with

---

**1.** On this motion, I have viewed the evidence in the light most favorable to plaintiff and I have drawn all reasonable inferences in her favor.

the intention of spending the night and returning to Ohio early the next morning. She was unfamiliar with the area, however, and got lost driving from West Point to Newburgh. It took plaintiff an hour and a half to make what should have been a 25–minute trip. She did not arrive at the hotel until approximately 1 a.m.

After requesting some extra towels at the front desk, plaintiff went to her room, which was on the first floor adjacent to the parking lot. The hotel security guard met her at the door to her room with some extra towels. Her boyfriend's car, which she had used and which he intended to retrieve the next day, was parked just a few feet away from the door to her room. Plaintiff planned to take a shuttle van early the next morning to the airport for the flight back to Ohio.

The security guard was not dressed in a uniform but was in plain clothes. As he handed the towels to plaintiff, he noticed a man on a flight of nearby stairs walking down from the second floor of the hotel to the ground floor. The man did not look suspicious. He made eye contact with the security guard and they nodded at each other. Plaintiff did not see the man. The security guard left, without waiting to see where the man went. Nor did the security guard hear the sound of a car door closing or car engine starting. As there were vending machines and garbage receptacles on the second floor, the man did not need to go downstairs to use the vending machines or to dispose of garbage.

Although it was now approximately 1:30 in the morning, the security guard gave no thought to speaking to the man. Nor did he give any thought to whether he should simply wait a moment to observe where the man went or what he did. The security guard did not consider approaching the man to identify himself as a security guard or to ask whether the man needed any assistance or was a guest. Although he had previously been employed in a security position, the security guard had never been provided with the Holiday Inn security officer's guide. Nor had he received any training from the Holiday Inn.

A few minutes later, plaintiff, who was in her room, decided to call the front desk to place a wake-up call. The telephone, however, did not have the room number on it. Consequently, plaintiff opened her room door to check her room number. When she started to call the front desk, she forgot the room number. Hence, she had to check the room number again. When she opened the door the second time, she saw a man at the door to the next room. They made eye contact, and although she was slightly startled, she thought nothing of it. She did not think he looked suspicious.

After arranging for a wake-up call, and as she was preparing for bed, plaintiff decided to leave some money and a note for her boyfriend in his car. Because the door to her room had a sign on it stating that it was a self-locking door, she took her room key with her. She left the room to go to the car, but the door to the room did not close behind her. When she was in the car, she remembered that she had some other money in the room that she also wanted to leave for her boyfriend. Hence, she walked back to her room. As she did so, she noticed that the room door was ajar. She walked five or six steps into the room. She did not shut the door behind her, because she intended to immediately return to the car after retrieving the additional money. As she had her back to the door, however, she heard the door close.

She realized then that someone had entered the room. It was an intruder, who proceeded over the course of the next hour-and-a-half to rape and sodomize plaintiff. The intruder held a knife to plaintiff's throat and repeatedly threatened to kill her. He raped her three times and smothered her face with clothing and pillows. He bound and gagged her before escaping into the night. He was never identified or apprehended.

Plaintiff untied herself and called the front desk. The security guard went to her room immediately. After he spoke to her briefly and the police were called, however, he left her and waited outside the room for the police to come because he was uncomfortable with the situation. He did not stay to try to comfort her nor did he arrange for one of the

women at the front desk to come to her assistance. After the police arrived, he gave a description of the man he had seen on the stairs, from which a composite was prepared.

Plaintiff spent the remainder of the night being treated and examined at the hospital. Although her boyfriend arrived and tried to comfort her, her reaction was to apologize repeatedly, as if she had done something wrong. She was at the hospital for eight hours and was subjected to, among other things, a pelvic examination and a pregnancy test. She then went to the police station, where she was asked to give a statement and review mug shots. She also gave a description of the attacker, from which a composite was prepared. On Monday afternoon, she flew back to Ohio. When she arrived home, everyone was crying, "as if someone had died."

Some eight months prior to the attack on plaintiff, a woman had been knocked down in a purse-snatching, at approximately the same time of night, in the parking lot of the hotel. There had been other, albeit more minor, criminal incidents as well at the hotel, including the abandonment of a stolen car in the parking lot. In addition, other hotels in the immediate vicinity of the Holiday Inn also suffered from incidents of crime.

The door to plaintiff's room was not working properly on the night she was attacked. The doors to the hotel room had self-closing hinges on them, which would have caused the doors to close automatically if they had been functioning properly. Of the two self-closing hinges on the door to plaintiff's room, one was missing a pin that was necessary to its proper functioning and the other was not properly set. Consequently, the door to plaintiff's room did not close by itself as it should have. Had the two hinges been working properly, the door would have automatically closed behind plaintiff when she went to the car and again when she re-entered her room. In addition, the lighting in the hotel parking lot and in the area of plaintiff's room was inadequate. There were dark spots and uneven levels of illumination and the area was "drastically underlit."

## B. *The Effect of the Attack on Plaintiff*

Plaintiff's parents, sister, and boyfriend testified about the profound changes in plaintiff's personality and life as a result of the attack. Prior to the incident, she was a cheerful, bubbly, friendly, innocent, trusting person who never locked the door to her house. In her father's words, she "enjoyed life."

After the incident, however, plaintiff was moody, depressed, and irritable. She was unable to enjoy life. For a period she could not sleep and later she slept too much. She no longer trusted anyone. Not only would she always lock the door to the house, she would not answer the door when the doorbell rang. She rarely spent time with her friends and easily became hysterical. She constantly looked over her shoulder and was afraid of strangers. She became paranoid. When driving, for example, she was always fearful of running out of gas. She never left home alone.

Plaintiff had to quit one of her two jobs because it did not require much thinking and she found herself constantly thinking about what had happened to her. She had problems performing her duties in her other job at a grocery store because she was afraid to wait on individuals who reminded her of the rapist and because she was afraid of being robbed. When she and her boyfriend drove to Texas on a trip, she refused to stop at a hotel or motel, and they spent the night in the car at a truckstop. For some seven months plaintiff had to live with the fear of AIDS, until she was able to take an AIDS test. Although the test was negative, both she and her father described the agonizing ordeal of going for the test and waiting for the results. Moreover, the tests must be repeated for two years.

Plaintiff has received extensive psychological counseling and will continue to need counseling for some time into the future. Her sessions cost $120 per hour. In the beginning she had one session a week. Later it was a session every other week and at times it was less often than that. Plaintiff's course of treatment included relaxation therapy and exercises to help plaintiff "desensitize" herself.

Plaintiff's original treating psychologist (Dr. Driscoll) testified that plaintiff suffered from post traumatic stress disorder ("PTSD") and from nightmares, anxiety attacks, heart palpitations, shortness of breath, sweaty palms, crying spells, and a generalized fear of men. Plaintiff "played" the rape "over and over again in her mind." Initially, there was sleeplessness and later plaintiff slept for unusually long periods. At one point plaintiff developed a tic or twitch as a result of the stress as well as a stutter response.

Dr. Driscoll noted that plaintiff had made some progress. Dr. Driscoll also testified as follows:

> I think she's going to need some continued support for her PTSD for *several more months at least.* It is very difficult to predict exactly how long she may need more treatment, but *I would assume for several more months,* as long as she is continuing to have some anxiety.

> She is continuing to progress, and my prognosis would be that if she continues to receive treatment for as long as she needs it, she'll recover, she won't develop a phobia of traveling.

> I suspect that she will always have more anxiety towards strangers than somebody who hasn't experienced this even after she has finished treatment. I suspect that traveling will always be difficult for her. I wouldn't expect that she would be—you wouldn't expect she wouldn't be able to travel at all. She is learning these coping skills of being able to deal with society, and she will be able to handle that, but she probably will always have more trouble than most people do.

(Driscoll Tr. 64–65).

Because of a change in the nature of her practice, Dr. Driscoll discontinued her treatment of plaintiff in December 1995. Hence, when she testified at trial, Dr. Driscoll had not treated plaintiff in a number of months and plaintiff was still going through the process of finding another therapist with whom she was comfortable.

Plaintiff was examined in connection with this case by a rape trauma expert, who testified that plaintiff suffered from chronic PTSD, as well as a major depressive episode, which was in partial remission. She testified that plaintiff's symptoms were similar to those of other rape victims who suffered from rape trauma syndrome. Plaintiff suffered from "intrusive memories" and she slept excessively to try to escape from her fears and negative feelings. At the same time, plaintiff suffered from "extremely frightening" nightmares and dreamed of being attacked and chased. Plaintiff exhibited a "numbness to the world" and "pulled away" from friends and family. Plaintiff also exhibited symptoms of depression, despair, shame, humiliation, and helplessness, as well as sexual difficulties. Plaintiff also had to deal with the reactions of persons who viewed her as "the poor girl who got raped." Plaintiff remained vulnerable to being attacked again and to crowds, nighttime, being alone, and being with strangers. The rape trauma specialist testified that plaintiff's fearfulness and lack of trust will remain with her "for quite a long time." With treatment, some "modest improvement" is expected.

Plaintiff is now engaged to her boyfriend. They expect to re-locate to Texas after they are married next year.

### C. *Prior Proceedings*

This diversity case was commenced on April 18, 1995. Plaintiff asserted claims for negligence, breach of warranty, and fraud. The claims for breach of warranty and fraud as well as a request for punitive damages were eventually withdrawn.

The case was tried on May 13–16 and 20, 1996. The jury returned its verdict on May 20th.

This motion followed.

### DISCUSSION

### A. *Standards Applicable to Motions for Judgment as a Matter of Law or for a New Trial*

A jury verdict is not to be set aside and judgment entered as a matter of law pursuant to Fed.R.Civ.P. 50(b) unless " 'the evidence is such that, without weighing the credibility of the witnesses or otherwise con-

sidering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [jurors] could have reached.'" *Samuels v. Air Transp. Local 504,* 992 F.2d 12, 14 (2d Cir.1993) (*quoting Simblest v. Maynard,* 427 F.2d 1, 4 (2d Cir.1970)); *accord United States v. One Parcel of Property Located at 121 Allen Place,* 75 F.3d 118, 120–21 (2d Cir.1996).

■ In considering a Rule 50(b) motion, "a trial court must view the evidence in a light most favorable to the non-movant and grant that party every reasonable inference that the jury might have drawn in its favor." *Samuels,* 992 F.2d at 16. Judgment as a matter of law is to be entered only where there is such a "complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture." *Mattivi v. South African Marine Corp.,* 618 F.2d 163, 168 (2d Cir.1980); *see also Logan v. Bennington College Corp.,* 72 F.3d 1017, 1022 (2d Cir.1995); *Cruz v. Local Union No. 3,* 34 F.3d 1148, 1154 (2d Cir.1994).

■ A motion for a new trial pursuant to Fed.R.Civ.P. 59 may not be granted on the basis of the weight of the evidence unless the jury's verdict is "seriously erroneous." *Binder v. Long Island Lighting Co.,* 57 F.3d 193, 202 (2d Cir.1995); *accord Piesco v. Koch,* 12 F.3d 332, 344–45 (2d Cir.1993). A trial court may refrain from setting aside a verdict and ordering a new trial "[w]here the resolution of the issues depended on assessment of the credibility of the witnesses." *Metromedia Co. v. Fugazy,* 983 F.2d 350, 363 (2d Cir.1992), *cert. denied,* 508 U.S. 952, 113 S.Ct. 2445, 124 L.Ed.2d 662 (1993).

## B. *Defendant's Motion*

In support of its motion to set aside the jury's verdict, defendant makes three arguments: the jury's finding of liability is against the weight of the evidence; the jury's pain and suffering awards are excessive; and the jury's award of $150,000 for future psychological counseling is speculative and without evidentiary support in the record.

### 1. *Liability*

■ The record contains substantial evidence to support the jury's findings that defendant was negligent and that its negligence proximately caused plaintiff to suffer injury.

■ Although an innkeeper, or owner or operator of a hotel, is not absolutely responsible for the safety of its guests, an innkeeper does have a duty to exercise reasonable care to protect its guests, while on the premises, from the reasonably foreseeable criminal acts of third persons or intruders. *Penchas v. Hilton Hotels Corp.,* 198 A.D.2d 10, 603 N.Y.S.2d 48, 49–50 (1st Dep't 1993) (denying summary judgment motion by hotel owner in negligence suit brought by guest who was robbed in hotel driveway); *Splawn v. Lextaj Corp.,* 197 A.D.2d 479, 603 N.Y.S.2d 41, 42–43 (1st Dep't 1993) (affirming jury verdict against hotel owner in favor of woman who was raped in her hotel room by a stranger); *Pantages v. L.G. Airport Hotel Assoc., Inc.,* 187 A.D.2d 273, 589 N.Y.S.2d 426, 427 (1st Dep't 1992) (affirming jury verdict against motel owner in favor of woman who was raped and sodomized in her motel room); *see also Garzilli v. Howard Johnson's Motor Lodges, Inc.,* 419 F.Supp. 1210 (E.D.N.Y.1976) (upholding jury verdict against motel owner in favor of woman who was sexually assaulted in her motel room by an intruder).

In the present case, the record contained sufficient evidence to support the jury's finding that there was a reasonably foreseeable risk of injury to plaintiff while she was a guest at the hotel from criminal acts of third persons. Indeed, a woman had been the victim of a purse-snatching in the parking lot at approximately the same time of the evening just eight months earlier. Moreover, there were other reported incidents of crime at the hotel as well as at other hotels in the immediate vicinity. The hotel was located in a cluster of hotels off an exit of the New York State Thruway. Although no other rapes or sexual assaults were reported at defendant's hotel, the purse-snatching and other incidents as well as the location of the hotel should have given defendant reason to believe that there was a risk of physical harm

to its guests from criminal acts of third parties. *See Jacqueline S. v. City of New York,* 81 N.Y.2d 288, 598 N.Y.S.2d 160, 163, 614 N.E.2d 723, 726 (1993) ("the past experience relied on to establish foreseeability [need not] be of criminal activity at the exact location where plaintiff was harmed or . . . of the same type of criminal conduct to which plaintiff was subjected"); *Splawn,* 603 N.Y.S.2d at 42–43 ("there is no requirement that the criminal conduct be of the same type as that to which plaintiff was subjected to establish foreseeability . . ., and indeed burglary is a willful act from which physical injury can reasonably be said to be a probable consequence").

The jury's findings that defendant acted unreasonably in proportion to the risk of injury and that its negligence proximately caused plaintiff to suffer injuries are also well supported by the evidence. The jury could have reasonably found that defendant was negligent in at least three respects: the failures of the security guard; the improper functioning of the self-closing hinges on the door to plaintiff's room; and the deficient lighting.

The security guard saw—and ignored—the apparent rapist just a few minutes before the rape occurred.[2] The security guard was not wearing a uniform. He had received no training from defendant and had not even been provided with the Holiday Inn security manual. He took no action with respect to the man on the stairs. When he saw the man, he gave absolutely no thought to whether he should approach the man, even though it was 1:30 a.m. and there was no apparent reason for the man to be walking down the stairs. If the security guard had been wearing a uniform, or if he had approached the man to identify himself as a hotel employee, or if he had inquired as to whether the man was a guest or whether he needed any assistance, the man might have been induced to leave. Alternatively, the security guard could have simply stood and watched the man for a few moments to see what he did. Instead, the security guard ignored him com-

pletely and returned to the front desk area, where he remained for about an hour. At the very least, the security guard should have considered whether to take any action. Indeed, a reasonable security guard would have spoken to the man unobtrusively to identify himself as a hotel employee (if he were not already readily identifiable as such) and to inquire whether the man needed assistance or was a guest. As plaintiff's security expert testified, a prudent innkeeper seeks to deter crime by taking affirmative measures.

In addition, plaintiff's lock expert testified that the self-closing hinges on the door to plaintiff's room were not functioning properly. One hinge was missing a pin. The other was not set properly. Consequently, the door did not close by itself, as it should have, when plaintiff went to the car. Nor did it close when she re-entered the room to retrieve the additional money. The jury could have found that if the hinges had been properly maintained and were working properly, the door would have closed by itself and the intruder would not have been able to enter the room.

Finally, plaintiff's lighting expert testified that the lighting was inadequate and uneven. The jury could have reasonably found that the assailant was able to hide in the dark spots and that he would have been detected by plaintiff had the lighting been brighter and more even. In addition, the jury could have reasonably concluded that it was unreasonable for defendant not to have improved the lighting when it was aware of the prior incidents of crime. The jury also could have concluded that proper lighting in itself would have acted as a deterrent, as an intruder would have been more likely to hesitate to commit a criminal act if he knew he could be plainly seen.

When all three of these factors are taken together—the failures of the security guard, the defective self-closing hinges, and the inadequate lighting—the jury's finding of 60% negligence on the part of defendant is com-

---

**2.** There is little doubt that the man on the stairs was the rapist. The security guard gave a description of the man to the police, who prepared a composite. Plaintiff gave a description of the man who raped her to the police, who prepared a second composite. Both composites were admitted into evidence, and they are virtually identical. (PX 6A, 6B).

pletely justified. *Cf. Garzilli,* 419 F.Supp. at 1212 (although sliding glass doors to motel room gave the appearance of being locked, they could be opened from the outside with little difficulty); *Jacqueline S.,* 598 N.Y.S.2d at 161, 163, 614 N.E.2d at 724, 726 (question of fact existed for trial as to whether landowner's failure to provide locks on doors constituted actionable negligence); *Pantages,* 589 N.Y.S.2d at 427 (plaintiff was carried into motel by her assailants in full view of the clerk on duty).

### 2. *Damages for Pain and Suffering*

Defendant argues that the jury's awards of $750,000 for past pain and suffering and $600,000 for future pain and suffering are excessive. I disagree. The jury's pain and suffering awards are firmly supported by the record and are well in line with verdicts approved in similar cases.

The standard of review of a jury's award of damages in a diversity case based on New York law tried in a federal district court was the subject of an opinion issued by the United States Supreme Court just two days ago. In *Gasperini v. Center for Humanities, Inc.,* —— U.S. ——, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996), the Court held that in reviewing the excessiveness or inadequacy of a jury's award of damages in a diversity case governed by New York law, a federal district court is to apply C.P.L.R. § 5501(c) (McKinney 1995). That section provides in part as follows:

> In reviewing a money judgment ... in which it is contended that the award is excessive or inadequate and that a new trial should have been granted unless a stipulation is entered to a different award, the appellate division shall determine that an award is excessive or inadequate *if it deviates materially from what would be reasonable compensation.*

C.P.L.R. § 5501(c) (McKinney 1995) (emphasis added).[3] Although section 5501(c) is

phrased as an instruction to the Appellate Division, as the Supreme Court confirmed in *Gasperini,* trial judges must apply it as well. —— U.S. at ——, 116 S.Ct. at 2221.

■ To determine whether a jury verdict "deviates materially from what would be reasonable compensation," New York courts compare the award to verdicts approved in similar cases. *Gasperini,* —— U.S. at ——, 116 S.Ct. at 2218 (*citing Leon v. J & M Peppe Realty Corp.,* 190 A.D.2d 400, 596 N.Y.S.2d 380, 389 (1st Dep't 1993), and *Johnston v. Joyce,* 192 A.D.2d 1124, 596 N.Y.S.2d 625, 626 (4th Dep't 1993)); *see also Consorti,* 72 F.3d at 1013. Here, the jury's award of a total of $1.35 million for pain and suffering, which must be reduced 40% by the jury's findings on comparative fault, is comparable to other awards in similar cases where guests at a hotel or motel were sexually assaulted. *Garzilli,* 419 F.Supp. at 1211 ($2.5 million in compensatory damages, including lost wages); *Splawn,* 603 N.Y.S.2d at 42 ($1.8 million for past pain and suffering and $200,-000 for future pain and suffering); *Pantages,* 589 N.Y.S.2d at 427 ($1.5 million for past pain and suffering and $375,000 for future pain and suffering, reduced by jury's finding of 50% contributory negligence).

■ Moreover, on the facts of this case, the jury's award of $750,000 for past pain and suffering surely does not "deviate[ ] materially from what would be reasonable compensation." Plaintiff was viciously raped at knife point three times by a stranger who repeatedly threatened to kill her. She was held captive and was sodomized for an hour-and-a-half. At the time, she was only 21 years old. As a consequence, she suffered extensive psychological damage and found herself "play[ing]" the rape "over and over again in her head." Although she slept excessively to try to escape from her memories,

---

**3.** In contrast, in reviewing jury awards on federal claims, federal courts have considered "whether the award was so excessive as to shock the conscience of the court." *Consorti v. Armstrong World Indus., Inc.,* 72 F.3d 1003, 1011 (2d Cir. 1995). The "deviates materially" standard of C.P.L.R. § 5501(c) requires "closer surveillance"

than the "shock the conscience" standard; indeed, "[t]he 'deviates materially' standard ... influences the outcome by tightening the range of tolerable awards." *Gasperini,* —— U.S. at ——, 116 S.Ct. at 2218; *see also Consorti,* 72 F.3d at 1011–13.

she suffered from frightening nightmares. She developed a tic or twitch. Tragically, she became a different person, a person who lost, to a great extent, the ability to enjoy life.

██ Likewise, the jury's award of $600,000 for future pain and suffering is reasonable and is well supported by the evidence. Although plaintiff has shown improvement, the jury was entitled to find from the evidence in the record that plaintiff's problems will continue into the future and that the memories of the attack will always remain with her. The jury heard plaintiff testify and observed her for approximately five days. It heard that plaintiff is likely to continue to suffer significantly in the future and, indeed, in some respects for the rest of her life.

The Second Circuit recently observed in *Consorti* as follows:

> While the law seeks by reasonable compensation to make a plaintiff whole, we must recognize that compensation for suffering can be accomplished only in a symbolic and arbitrary fashion.... [M]oney awards do not make one whole; they do not alleviate pain....

72 F.3d at 1009. Here, I doubt that the jury's award will make plaintiff whole or alleviate her pain. The jury's award, however, is a reasonable, if symbolic, effort to do so.

In sum, the jury's award of $1.35 million for past and future pain and suffering is sustained.

### 3. *Damages for Future Psychological Counseling*

██ Defendant's argument that the jury's award of $150,000 for future psychological counseling is excessive is more compelling. Indeed, as plaintiff's counsel concedes, at a rate of $120 per session, assuming one session per week, the jury's award of $150,000 would provide for future psychological counseling for more than 24 years.[4] Defendant suggests that the award for future psychological counseling should be reduced

to $1,920—the cost of weekly sessions at $120 per session for four months (or sixteen weeks).

As noted above, under the "deviates materially" standard of section 5501(c), courts should compare the amount of the jury's award with verdicts approved in similar cases. For purposes of evaluating the jury's award for future psychological counseling, however, it is difficult to find comparable cases because so many different factors will affect the extent to which future psychological treatment will be required, including: the nature and severity of the injury suffered, plaintiff's age, the progress made to date, the cost of counseling, and the prognosis. In fact, research has not disclosed a New York case with facts sufficiently similar to the facts of this case to provide a meaningful basis of comparison. *Cf. Meredith v. City of New York*, —— A.D.2d ——, 632 N.Y.S.2d 812, 813 (2d Dep't 1995) (reducing award for past and future psychological injury from $1 million to $700,000 for mother of deceased four year-old child); *Stackhouse v. New York City Health & Hosp. Corp.*, 179 A.D.2d 357, 577 N.Y.S.2d 833, 834 (1st Dep't 1992) (upholding award of $116,000 for future psychological counseling for infant injured at birth); *Knight v. Long Island College Hospital*, 106 A.D.2d 371, 482 N.Y.S.2d 503, 504 (2d Dep't 1984) (vacating $1 million award for future physical and psychological injury to injured infant). Moreover, other cases involving sexual assault have not separated out future psychological counseling as a separate item of damages but have instead folded such damages into a general compensatory damages award.

Accordingly, my evaluation of the propriety of the jury's award of $150,000 in damages for future psychological counseling must be limited to an evaluation of the evidence in this case. Based on this evidence, the jury's award of $150,000 deviates materially from what would be reasonable compensation for future psychological counseling. Defendant's proposed award of $1,920, however, is inadequate and also deviates materially from what would be reasonable.

---

4. At $120 per week, 52 weeks would cost $6,240 per year. Hence, assuming no inflation and no

discounting to present value, $150,000 would be more than 24 years worth of counseling.

Defendant relies heavily on Dr. Driscoll's testimony that plaintiff would need "continued support for her PTSD for several more months at least." (Driscoll Tr. 64–65). Defendant suggests that any award for future psychological counseling must be limited to "several"—or four—months. The jury, however, was not bound by this testimony, even though Dr. Driscoll was plaintiff's own witness. On the basis of the evidence in the record, the jury was entitled to find that plaintiff would need much more than just "several more months" of additional psychological counseling to fully recover from the incident.

First, Dr. Driscoll qualified her estimate or assumption of "several more months" with the words "at least." Moreover, Dr. Driscoll had not treated plaintiff for several months. In the interim, plaintiff had undergone a difficult transition to a new therapist and the trial itself was a traumatic experience. Dr. Driscoll also acknowledged that plaintiff would "always" have certain difficulties. Dr. Driscoll testified, for example, that "traveling will always be difficult for [the plaintiff]" and that plaintiff "will always have more anxiety towards strangers." Dr. Driscoll further testified that, despite the progress that she had made, plaintiff would always be "vulnerable" to a relapse "were she to experience another trauma."

The jury also heard testimony that plaintiff and her boyfriend are planning on moving to Texas after they are married next year. The jury could have reasonably concluded that leaving her family in Ohio, traveling to a new state (where she would undoubtedly meet many strangers), and starting a marital relationship would cause plaintiff to have difficulties that would require counseling.

Finally, the jury was presented with extensive evidence, reviewed above, of the profound changes in plaintiff's personality and her ability to enjoy life. The jury could have reasonably found that the difficulties that accompanied these profound changes would necessitate years of further psychological counseling for a person who was only 23 years old at the time of trial. Indeed, the rape trauma expert who testified at trial indicated that plaintiff's psychological problems would remain with her "for quite a long time."

Given the extensive evidence concerning plaintiff's need for future psychological counseling, defendant's argument that the award for future psychological counseling should be reduced to the cost of weekly sessions for four months is without merit. On the other hand, even taking the evidence in the light most favorable to plaintiff, the jury could not have reasonably concluded that plaintiff's injuries would require her to attend weekly counseling sessions for the next 24 years. Indeed, at the time of trial, plaintiff was receiving psychological counseling somewhat sporadically and, for much of her treatment with Dr. Driscoll, she received counseling only every other week.

For these reasons, the jury's award of $150,000 for future psychological counseling is excessive. A more reasonable conclusion, based on all the evidence presented at trial, construed in the light most favorable to plaintiff, is that plaintiff will need psychological counseling every other week for ten years. At $120 per session, the cost of plaintiff's future psychological counseling will be $31,200. Accordingly, I will order a new trial limited solely to the issue of the amount of damages for future psychological counseling unless plaintiff accepts a remittitur reducing the award for such damages to $31,200.[5]

### CONCLUSION

For the foregoing reasons, defendant's motion for a new trial or for judgment as a

---

5. Defendant argues that plaintiff's counsel's references in his summation to, among other things, the wealth of defendant and the need to "send a message" unduly prejudiced the jury by arousing its sympathy. This argument is without merit. First, I sustained defense counsel's objections during plaintiff's counsel's summation. Second, I stressed in my charge to the jury, which immediately followed plaintiff's counsel's summation, that the jury was to evaluate the evidence calmly and objectively, without prejudice or sympathy. Third, this was a case where the facts spoke for themselves. The proceedings were not "irreparably tainted" by plaintiff's counsel's comments in summation. *See Matthews v. CTI Container Transport International Inc.*, 871 F.2d 270, 278 (2d Cir.1989).

matter of law is denied, except to the extent that a new trial will be ordered solely on the amount of damages for future psychological counseling unless plaintiff agrees to a reduction of the award for such damages to $31,200. Counsel for the plaintiff is to inform the Court of her decision regarding the remittitur by July 8, 1996. If plaintiff accepts the remittitur, judgment will be entered in favor of plaintiff in the amount of $838,049.08—which is 60% of $1,396,748.47, the sum of $750,000 for past pain and suffering, $600,000 for future pain and suffering, $6,417 for lost wages, $9,131.47 for other expenses and losses, and $31,200 for future psychological counseling. The judgment shall also include costs in favor of plaintiff.

SO ORDERED.