[764 NYS2d 416]

Tatia Morsette, Respondent, v "The Final Call," Appellant.

First Department, September 25, 2003

250

**APPEARANCES OF COUNSEL**

*Alan J. Rich* of counsel (*Baree N. Hassett* on the brief; *Law Offices of Alan J. Rich,* attorneys), for respondent.

*Joseph Fleming* of counsel (*Barbara Emmanuel Pershay* on the brief; *Joseph Fleming, P.C.*, attorney), for appellant.

**OPINION OF THE COURT**

NARDELLI, J.P.

The primary issue presented to us in this appeal is whether defendant's callous, unauthorized use of plaintiff's randomly selected, and then altered, photograph to illustrate an article addressing the plight of incarcerated women and their families warrants an award of punitive damages.

Plaintiff Tatia Morsette is the mother of a young boy, and with an extensive background in music and the performing arts, is a successful businesswoman working as a freelance promoter and personal manager for a number of entertainers, including comedians, actors and bands. Defendant "The Final Call," also known as FCN Publishing (FCN), is the official weekly newspaper (the newspaper) of the Nation of Islam and, as alleged by plaintiff, has a circulation of approximately 400,000, with the largest readership in the African-American community.

This libel action arises out of the newspaper's June 3, 1997 edition (volume 16, number 31), the front page of which states, in bold letters, "Mothers in Prison, Children in Crisis," and in smaller print "As female prison population grows, what will happen to the children?" Juxtaposed with the foregoing is a depiction of three women, two holding children; one of the women is plaintiff holding her son. Readers are then directed to an article on page 3.

The headline on page 3 provides "Mommy is in Jail," with the subtitle "U.S. female prison population explodes, children suffer, society faces dilemma." Juxtaposed with the text of the article are pictures of the same three women, which are modified to make it appear as if they are wearing prison attire. Plaintiff's son was also edited from the picture and her smile was graphically removed.

Plaintiff alleged that she first learned of the depiction from a cousin who had seen the subject article and telephoned her from Baltimore, Maryland. Plaintiff maintained that her large, close-knit family, as well as a number of her clients, had also seen or heard of the article and began to question whether she had ever been imprisoned. Plaintiff averred that as a result, she became depressed, anxious, embarrassed to be around others and reclusive, which had the effect of causing her to gain approximately 50 pounds and severely undermined her ability to function socially and professionally.

There is no dispute that the photograph of plaintiff with her son had been taken in October 1996 at an event called the "Day of Atonement" by a photographer who occasionally provided pictures to the newspaper. Defendant, after acquiring the photograph, placed it in a "Photo File," where it remained until May 1997, when James Muhammad, the editor of the newspaper, instructed his graphic artist, Nathan Muhammad, to find suitable pictures to illustrate a planned story on female inmates and their children. Plaintiff's photograph was then randomly selected and altered by Nathan Muhammad. Final approval was subsequently given by James Muhammad. There is also no dispute that James Muhammad was unacquainted with plaintiff, knew nothing about her, and made no attempt to ascertain her identity or obtain her consent to use her photograph prior to authorizing its use.

The newspaper never apologized to Ms. Morsette, purportedly because it did not know who she was, but in its July 27, 1999 edition, it printed the following rather uninspired correction:

"CLARIFICATION"

"A photo-graphic used on the cover of Vol. 16 No. 32 and a similar graphic used on the inside pages was for illustration purposes only and was not intended to convey the impression that the women were mothers or incarcerated. *The Final Call*

regrets any confusion that may have existed about the illustration."

The clarification, which was never clarified, refers the reader to the wrong edition of the newspaper. Plaintiff initially commenced this action against FCN, James Muhammad, Rosalind Muhammad (the article's author), Louis Farrakhan and the Nation of Islam, but it was later dismissed as against all of the defendants except for the publication itself.

Discovery ensued and in December 1999, defendant moved for summary judgment dismissing the complaint. The motion was denied by Justice Jane Solomon on or about April 17, 2000 and, on appeal, this Court affirmed, on the ground that issues of fact existed as to "[w]hether the pictures in question fairly implied that plaintiff was a criminal, and were therefore defamatory," obviating the need to prove special damages, and whether defendant " 'acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties' " (*Morsette v Final Call*, 278 AD2d 81, 82 [2000], quoting *Chapadeau v Utica Observer-Dispatch*, 38 NY2d 196, 199 [1975]).

A bifurcated trial was held over a period of six days commencing on May 22, 2001 and concluding on June 6, 2001, before Justice Nicholas Figueroa and a jury. At the conclusion of trial, the jury found FCN liable and awarded plaintiff compensatory damages in the amount of $640,000, consisting of $40,000 for injury to reputation, $100,000 for past mental anguish and emotional harm, and $500,000 for future mental anguish and emotional harm. The jury also awarded plaintiff $700,000 in punitive damages. Defendant appeals and we now modify to the extent of vacating the award of punitive damages, vacating or reducing the award for future emotional distress, and otherwise affirm.

In *Gertz v Robert Welch, Inc.* (418 US 323 [1974]), the United States Supreme Court held, inter alia, that although "[s]ome tension necessarily exists between the need for a vigorous and uninhibited press and the legitimate interest in redressing wrongful injury," and public figures "may recover for injury to reputation only on clear and convincing proof that the defamatory falsehood was made with knowledge of its falsity or with reckless disregard for the truth" (*id.* at 342), the Court also held that "private individuals are not only more vulnerable to injury than public officials and public figures; they are also more deserving of recovery. For these reasons, we conclude

that the States should retain substantial latitude in their efforts to enforce a legal remedy for defamatory falsehood injurious to the reputation of a private individual" (*id.* at 345-346).

The New York State Court of Appeals, in *Chapadeau v Utica Observer-Dispatch* (38 NY2d 196 [1975], *supra*), subsequently held that where the plaintiff is a private figure and the subject matter of the purportedly defamatory statement is "arguably within the sphere of legitimate public concern," media defendants, such as FCN, are to be held liable where the plaintiff can establish by a preponderance of the evidence that they "acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties" (*id.* at 199; *see also Huggins v Moore*, 94 NY2d 296, 301-302 [1999]; *Khan v New York Times Co.*, 269 AD2d 74, 77 [2000]).

This Court, in our prior decision upholding the denial of defendant's motion for summary judgment, implicitly acknowledged that defendant, under certain circumstances, may be held liable for damages arising out of the publication of a photograph illustrating an article on a matter of public concern.[1] The record herein clearly indicates that all of the issues identified in our prior decision were fairly litigated and presented to the jury and supports the jury's findings that defendant's depiction of plaintiff fairly implied that she was a criminal, and that defendant was guilty of a gross departure from the standards of responsible journalism when, without plaintiff's permission, it removed her picture from its files and altered it to indicate she was a convict.

Defendant also challenges the trial court's evidentiary rulings, and jury instructions, arguing that they abridged its constitutional rights to freedom of expression and the press, to a fair trial, to due process, and to equal protection of the law. FCN's arguments, however, are expressed primarily in generalities and a review of the trial transcript, including those pages to which defendant specifically alludes in its briefs, reveals not only the lack of merit of defendant's contentions, but also that Justice Figueroa made every effort to be fair and impartial to FCN. Accordingly, we reject these arguments.

Defendant further contends that the awards of compensatory and punitive damages are unjustified. Initially, we find

---

1. In *Nacinovich v Tullet & Tokyo Forex* (257 AD2d 523 [1999]), we held that photographic depictions, even those in the nature of cartoons, are subject to defamatory interpretation.

that the award of punitive damages is not supported by the record and the relevant case law and, as a result, should be vacated. We are constrained to reach this conclusion despite the callous indifference with which defendant doctored random photographs to imply criminal conduct. Indeed, it is precisely the randomness of defendant's conduct and the fact that such conduct was not directed specifically at this plaintiff that requires us to vacate the punitive damages award.

In general, in order for punitive damages to be awarded, the plaintiff must demonstrate that the defendant's conduct is intentional and deliberate, has fraudulent or evil motive, and has the character of outrage frequently associated with crime (*Prozeralik v Capital Cities Communications*, 82 NY2d 466, 479 [1993]; *Swersky v Dreyer & Traub*, 219 AD2d 321, 328 [1996]).

In defamation cases, the standard for awarding punitive damages is still higher under the law of our State. The New York State Court of Appeals, which, historically, has been zealous in protecting our constitutionally guaranteed right to free speech (*see generally Gross v New York Times Co.*, 82 NY2d 146, 151-152 [1993]; *Immuno A.G. v Moor-Jankowski*, 77 NY2d 235, 256 [1991], *cert denied* 500 US 954 [1991]), has held that even "actual malice," the constitutional standard for an award of compensatory damages to a public figure suing for defamation (*see New York Times Co. v Sullivan*, 376 US 254 [1964]),[2]

> "is insufficient by itself to justify an award of punitive damages, because that malice focuses on the defendant's state of mind in relation to the truth or falsity of the published information [citations omitted]. This does not measure up to the level of outrage or malice underlying the public policy which would allow an award of punitive damages, i.e., *'to punish a person for outrageous conduct which is malicious, wanton, reckless, or in willful disregard for another's rights'* [citations omitted]. *This kind of common-law malice focuses on the defendant's mental state in relation to the plaintiff and the motive in publishing the falsity—the pointed factors that punitive damages are intended*

---

**2.** "Actual malice" is defined as either knowledge that the publication was false or reckless disregard as to its truth or falsity (*New York Times Co. v Sullivan, supra* at 279-280; *Town of Massena v Healthcare Underwriters Mut. Ins. Co.*, 98 NY2d 435, 444-445 [2002]).

*to remedy."* (*Prozeralik v Capital Cities Communications, supra* at 479-480 [emphasis added]; *see also Marcus v Bressler*, 277 AD2d 108 [2000]; *Wellington Funding & Bus. Consultants v Continental Grain Co.*, 259 AD2d 323 [1999]; *Lewis v Newsday, Inc.*, 246 AD2d 434 [1998]; *Celle v Filipino Reporter Enters. Inc.*, 209 F3d 163 [2000].)

Requiring common-law malice in libel cases has also been described as necessary to "ensure that juries award punitive damages only when the defendant has received an illicit benefit. *Because the common law malice standard turns on the defendant's attitude toward the plaintiff, and not toward the truth, it penalizes only those defendants who have purposefully inflicted harm and have derived satisfaction from their wrongful acts*" (Note, *Punitive Damages and Libel Law*, 98 Harv L Rev 847, 861 [emphasis added]).

In *Present v Avon Prods.* (253 AD2d 183, 189 [1999], *lv dismissed* 93 NY2d 1032 [1999]), this Court held that a triable issue of common-law malice is raised only if a reasonable jury could find that the speaker was *solely* motivated by a desire to injure plaintiff, and that there must be some evidence that the animus was " 'the one and only cause for the publication' " (quoting *Stukuls v State of New York*, 42 NY2d 272, 282 [1977]; *accord Thanasoulis v National Assn. for Specialty Foods Trade*, 226 AD2d 227, 229 [1996]; *Ackerman v Bechhoefer*, 270 AD2d 878 [2000]; *Grier v Johnson*, 232 AD2d 846, 848 [1996]; *Weir v Equifax Servs.*, 210 AD2d 944, 945 [1994]).

In the matter at bar, notwithstanding defendant's reprehensible, irresponsible conduct, there is no evidence that defendant possessed the requisite "mental state in relation to the plaintiff" (*Prozeralik v Capital Cities Communications, supra* at 480), i.e., that the malice or ill will was directed specifically at plaintiff, to support an award of punitive damages. The evidence, in fact, indicates that plaintiff's photograph was randomly selected, and that the editor did not know plaintiff, or anything about her, when final approval was given to publish the altered photographs. Moreover, the record is bereft of any evidence that the libel suffered by plaintiff was "the one and only cause for the publication."

With regard to the remaining compensatory damage award, the scope of our review of a jury award is set forth in CPLR 5501 (c), as amended in 1986 (L 1986, ch 682, § 10), which provides, in pertinent part:

"In reviewing a money judgment in an action in

which an itemized verdict is required by rule forty-one hundred eleven of this chapter in which it is contended that the award is excessive or inadequate and that a new trial should have been granted unless a stipulation is entered to a different award, the appellate division *shall determine that an award is excessive or inadequate if it deviates materially from what would be reasonable compensation*" (emphasis added).

The courts of this state, prior to the 1986 amendment, would generally not disturb an award unless the amount was so exorbitant, or so inadequate, that it shocked the conscience of the court (*Harvey v Mazal Am. Partners*, 79 NY2d 218, 225 [1992]; *Donlon v City of New York*, 284 AD2d 13, 16 [2001]; Siegel, Practice Commentaries, McKinney's Cons Laws of NY, Book 7B, CPLR C5501:10, at 25). The adoption of the "deviates materially" standard was part of a series of tort reform measures triggered by spiraling costs and excessive verdicts (*see Donlon v City of New York, supra* at 15). Former Governor Mario Cuomo, in a memorandum reflecting his approval of the amendment, emphasized that "[t]his will assure greater scrutiny of the amount of verdicts and promote greater stability in the tort system and greater fairness for similarly situated defendants throughout the State" (Mem approving L 1986, ch 682, 1986 McKinney's Session Laws of NY, at 3184; *see also Gasperini v Center for Humanities, Inc.*, 518 US 415, 423-425 [1996]).

In order for us to determine whether the award in this matter "deviates materially from what would be reasonable compensation," we are required to review awards approved in similar cases (*Gasperini v Center for Humanities, Inc., supra* at 425; *Donlon v City of New York, supra* at 15-16; *Leon v J & M Peppe Realty Corp.*, 190 AD2d 400, 416 [1993]), while mindful of the fact that personal injury awards, especially those for pain and suffering, are subjective opinions which are formulated without the availability, or guidance, of precise mathematical quantification (*see Valentine v Lopez*, 283 AD2d 739, 743 [2001]; *Kahl v MHZ Operating Corp.*, 270 AD2d 623, 624 [2000]).

In *Caprara v Chrysler Corp.* (52 NY2d 114 [1981]), the Court of Appeals expounded on the task before us:

"It goes without saying that [the] court, lacking clairvoyance, in evaluating a verdict intended to

compensate for a projected long lifetime of pain, suffering, helplessness and all the other tangible and intangible losses that were sure to follow, faced an unusually difficult judgmental responsibility, for the fulfillment of which no less than a sophisticated elasticity will ever do. In no two cases are the quality and quantity of such damages identical. As has been pointed out by pragmatists and theorists who have wrestled with the problem of how damages in such cases may justly be arrived at, evaluation does not lend itself to neat mathematical calculation * * *" (*id.* at 126-127; *see also Bermeo v Atakent*, 241 AD2d 235, 239 [1998]).

■ In this matter, taking the foregoing into consideration, we find that the $40,000 award for presumed harm to reputation, in view of plaintiff's education and professional attainment, and the $100,000 award for four years of emotional distress suffered prior to the trial, are fairly supported by the medical and other evidence and do not deviate materially from what is reasonable compensation. The libel, however, had its greatest impact on plaintiff's health at the time she first learned of it and, while there are certainly lingering effects, the $500,000 award for future emotional distress is excessive to the extent that such award should be reduced to $300,000 or vacated and set down for a new trial.

Accordingly, the judgment of the Supreme Court, New York County (Nicholas Figueroa, J.), entered June 22, 2001, which awarded plaintiff damages of $1,340,000, consisting of $40,000 for injury to reputation, $100,000 for past emotional distress, $500,000 for future emotional distress, and $700,000 in punitive damages, plus interest, costs and disbursements, should be modified, on the law and the facts, to vacate the award for future and punitive damages, and the matter remanded for a new trial on the issue of future damages only, and otherwise affirmed, without costs, unless plaintiff, within 20 days of the service of a copy of this order, stipulates to reduce the award for future damages to the principal amount of $300,000, and to the entry of an amended judgment in accordance therewith.

MARLOW, J. (dissenting). I respectfully dissent.

This action is for libel. It arises out of defendant newspaper's unauthorized use of a photograph of plaintiff. For purposes of illustrating an article about the negative consequences to society following a mother's completion of a term in prison,

defendant's employees graphically altered the photograph to make it appear as though plaintiff were wearing a prison uniform, when, in the original photo, she was not. On a prior appeal from the denial of defendant's motion for summary judgment, this Court held that whether defendant's depiction of plaintiff in prison garb fairly implied that she was a criminal, and was therefore defamatory, and whether defendant had acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties, were issues of fact to be decided by the jury (278 AD2d 81 [2000]). The record shows that both of these issues were fairly litigated and fairly presented to the jury. The record also amply supports findings: (1) that defendant's depiction of plaintiff clearly and fairly implied, falsely, that she was a convicted criminal, and (2) that defendant was guilty of a gross departure from the standards of responsible journalism when, without plaintiff's permission, it removed her picture from its files and admittedly altered it to show her as a convict, utterly without any concern for its truthfulness.

With regard to the issue of damages, it is incumbent upon the court to examine whether the jury award "deviates materially from what would be reasonable compensation" (CPLR 5501 [c]) and, in doing so, we must look to awards approved in similar cases (*Donlon v City of New York*, 284 AD2d 13, 14-15 [2001]; *Leon v J & M Peppe Realty Corp.*, 190 AD2d 400, 416 [1993]; *Gasperini v Center for Humanities, Inc.*, 518 US 415, 425 [1996]). Applying this standard, I find that the $40,000 award for harm to personal reputation, in view of plaintiff's education and professional attainments, and the $100,000 award for past emotional distress and $500,000 award for future emotional distress are supported by the medical and other evidence and do not deviate materially from what is reasonable compensation.

Punitive damages may be awarded to punish a defendant who has acted maliciously and to discourage others from acting the same way. It is well settled that in order to recover punitive damages, a plaintiff must establish that a defendant's acts were motivated by common-law malice (*Prozeralik v Capital Cities Communications*, 82 NY2d 466, 479-480 [1993]).[1] In order to determine whether a defendant acted maliciously, the

---

1. We note that plaintiff satisfies this burden even under the "actual malice" standard defined in *New York Times Co. v Sullivan* (376 US 254 [1964]; *see Liberman v Gelstein*, 80 NY2d 429, 438 [1992] [under *New York*

factfinder must determine whether the statement was "made with deliberate intent to injure or made out of hatred, ill will, or spite or made with wilful, *wanton or reckless disregard of another's rights*" (PJI3d 3:30 [2003] [emphasis added]; *see also Prozeralik*, 82 NY2d at 479-480, quoting *Vassiliades v Garfinckel's, Brooks Bros.*, 492 A2d 580, 593 [DC 1985] [underlying purpose of punitive damages is to "punish a person for *outrageous conduct which is malicious, wanton, reckless, or in willful disregard for another's rights*" (emphasis added)]).[2]

Defendant argues, not that punitive damages can never be awarded in defamation cases, but rather that the court's charge to the jury on this issue was erroneous as a matter of law and that the evidence adduced at trial does not support a punitive damages award. Alternatively, defendant maintains that the punitive damages award is excessive.

Specifically, defendant claims that the court should have charged the jury that plaintiff had to prove that defendant acted with malice by clear and convincing evidence in order to recover punitive damages. However, the judge's charge to the jury closely tracked the language of the pattern jury instruction for punitive damages in defamation cases (*see* PJI3d 3:30 [2003]), language which I find legally proper.[3]

In any event, upon my review of the record, I find that whether plaintiff's burden of proof is by a preponderance of the evidence (*see Corrigan v Bobbs-Merrill Co.*, 228 NY 58, 66-67 [1920]; *Greenbaum v Svenska Handelsbanken, N.Y.*, 979 F Supp 973, 975-982 [1997]) or by clear and convincing evidence (*see*

---

*Times* malice standard, plaintiff must demonstrate that statements were made with a high degree of awareness of their probable falsity]).

**2.** As explained by Judge Oshrin in *Doe v Merck & Co.* (30 Med L Rptr 1833, 1834 [Sup Ct, Suffolk County, May 30, 2002]):

"The nature of the conduct which will justify an award of punitive damages has been variously described as conduct having a high degree of moral culpability [citations omitted]; or conduct activated by an evil and reprehensible motive which manifests a conscious disregard of the rights of others or conduct so reckless as to amount to such disregard [citations omitted]; or actions which constitute gross recklessness or intentional wanton or malicious conduct [citations omitted]; or actions which constitute willful or wanton negligence or recklessness [citations omitted]; or conduct which is grossly negligent and reckless [citations omitted]; or conduct which is so flagrant as to transcend mere carelessness [citations omitted]."

**3.** This charge does not specify the evidentiary standard for proving entitlement to punitive damages. In relevant part, the charge states that "[t]he burden of proving that defendant acted with malice is on the plaintiff." (*Id.*)

*Camillo v Geer*, 185 AD2d 192, 194 [1992]), plaintiff, in my judgment, unquestionably satisfied the more exacting clear and convincing evidentiary standard. Indeed, plaintiff is a well-educated, professionally successful woman, who is also a single mother. Defendant is a religious publication described by its editor-in-chief as the "official organ of the Nation of Islam." Defendant, a publication which is designed to provide religious teaching and guidance primarily to African-Americans in accordance with the principles of Islam, grossly misrepresented plaintiff as a prison convict.

In June 1997, defendant newspaper released an article entitled "Mothers in Prison, Children in Crisis." The front page of the publication showed plaintiff holding her son and smiling. The jump pages of the article, in order to illustrate the front page headline, contained the same photograph. However, defendant's employees deliberately altered plaintiff's photograph, deleted her son from the picture, graphically removed her smile, and superimposed prison clothing on her image.

The photograph of plaintiff and her son had been taken in October 1996 at an event called "The Day of Atonement" by a photographer who periodically provided pictures to defendant. Defendant acquired plaintiff's photograph and placed it in its "Photo File," where it remained until May 1997, when defendant's editor-in-chief requested his graphic artist to find pictures to illustrate a story on female prison inmates and their children. The graphic artist selected and altered plaintiff's photograph. Defendant's editor-in-chief admitted that he did not know plaintiff, and the record is barren of any evidence he knew anything at all about her. He further admitted he did not obtain her permission to use the photograph in connection with the article. Moreover, defendant's editor-in-chief admitted that no one from the publication made any attempt whatsoever to identify plaintiff or the other women depicted in the article prior to publication. Thus, utterly without the slightest concern for plaintiff's right to her flawless reputation, defendant falsely labeled her a convicted criminal in prison.

I therefore most respectfully disagree with my colleagues in the majority, and I find that defendant did possess the requisite "mental state in relation to the plaintiff" (*Prozeralik*, 82 NY2d at 480) to justify an award of punitive damages by its admitted and blatant disregard in failing to make even the slightest effort to ascertain whether its deliberately altered depiction of plaintiff was accurate. I believe, most respectfully, that the majority's reliance on *Stukuls v State of New York* (42 NY2d

272 [1977]); *Present v Avon Prods.* (253 AD2d 183 [1999], *lv dismissed* 93 NY2d 1032 [1999]); *Thanasoulis v National Assn. for Specialty Foods Trade* (226 AD2d 227 [1996]); *Ackerman v Bechhoefer* (270 AD2d 878 [2000]); *Grier v Johnson* (232 AD2d 846 [1996]); and *Weir v Equifax Servs.* (210 AD2d 944 [1994]) is misplaced as these cases all deal with the issue of overcoming the defense of privilege by establishing common-law malice. None of them deals with the issue of punitive damages.

Moreover, defendant believes that the nature of the publication did not require any apology. Instead, defendant claims that the "clarification" it published prior to this lawsuit was adequate to explain that the use of plaintiff's likeness portraying her as a convict conspicuously clothed in prison attire was only for illustration purposes and not intended to imply that she was a convict or incarcerated.[4] Indeed, the so-called clarification neither effectively explains defendant's wrongdoing nor appropriately apologizes for flagrantly victimizing this plaintiff. Remarkably, defendant continued to insist, even throughout oral argument, that there is no evidence that the article and accompanying, egregiously misleading photographs are defamatory.

Based on these particular facts and circumstances, I find that the evidence fully supports the jury's punitive damages award.

Motion seeking leave to strike reply brief and for other related relief denied.

SAXE and FRIEDMAN, JJ., concur with NARDELLI, J.P.; ROSENBERGER and MARLOW, JJ., dissent in a separate opinion by MARLOW, J.

Judgment, Supreme Court, New York County, entered June 22, 2001, modified, on the law and the facts, to vacate the award for future and punitive damages, and the matter remanded for a new trial on the issue of future damages only, and otherwise affirmed, without costs, unless plaintiff, within 20 days of the service of a copy of this order, stipulates to reduce the award for future damages to the principal amount of $300,000, and to the entry of an amended judgment in accordance therewith. Motion seeking leave to strike reply brief and for other related relief denied.

4. Even the clarification itself contained an error as it referred the readers to the wrong edition of the paper. The article appeared in volume 16, number 31; however, the clarification referred to volume 16, number 32.